UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------  X
DAVID MULLEN,                             :
                                          :
           Plaintiff,                 :   Case No.: _____
                                          :
   -against-                             :   DEMAND FOR JURY TRIAL
                                          :
EMPIRE RESORTS, INC., EMANUEL R.          :
PEARLMAN, KEITH R. HORN, EDMUND           :
MARINUCCI, NANCY A. PALUMBO, GERARD       :
EWE KENG LIM, RYAN ELLER, and NANETTE     :
L. HORNER,                                :
                                          :
           Defendants.                :
                                          :
                                          :
----------------------------------------  X

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, David Mullen, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Empire Resorts, Inc. ("Empire" or the "Company") and the members of the Company's board of directors and executive officers (collectively referred to as the "Board" or the "Individual Defendants" and, together with Empire, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of Empire by Hercules Topco LLC, a Delaware limited liability company ("Parent"), and Hercules Merger Subsidiary Inc., a Delaware corporation and a

1

wholly-owned subsidiary of Parent ("Merger Sub"), pursuant to which Merger Sub will be merged with and into the Company (the "Proposed Transaction"). Both Parent and Merger Sub were formed for the sole purpose of consummating the proposed acquisition. Under the Proposed Transaction, Kien Huat Realty III Limited ("Kien Huat") and affiliates of Genting Malaysia Berhad ("GenM") will acquire all of the outstanding equity of the Company.

2. On August 18, 2019, Empire entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Parent will acquire Empire, with Merger Sub merging with and into Empire, and Empire will continue as the surviving corporation (the "Merger").

3. Upon completion of the merger, Empire shareholders will receive $9.74 in cash per share of common stock, and with each share of the Company's Series B preferred stock receiving the same consideration on an as-converted to common stock basis (the "Merger Consideration").

4. On September 24, 2019, in order to convince Empire public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Preliminary Proxy Statement with the SEC. Then on October 11, 2019, the Defendants filed a Definitive Proxy Statement (the "Proxy") with the SEC, which again contained materially incomplete and misleading information, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) critical financial projections, including the net income projections and free cash flows for the Company; (ii) the valuation analyses performed by the financial advisors; (iii) the relationship between the financial advisor and the Company.

6. The special meeting of Empire's stockholders to vote on the Proposed Transaction is scheduled to take place on November 13, 2019 (the "Shareholder Vote"). Therefore, it is

imperative that the material information omitted from the Proxy is disclosed prior to the Shareholder Vote, so that Empire's stockholders can properly exercise their corporate voting rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Empire's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over

the defendant in any federal district court." *Id.* at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Company has its corporate headquarters in Monticello, New York. In addition, Empire's common stock trades on the NASDAQ, which is headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Empire common stock.

12. Defendant Empire is a public company incorporated under the laws of Delaware with principal executive offices located at Monticello Casino and Raceway 204 State Route 17B, Monticello, NY 12701. Empire's common stock is traded on the NASDAQ under the ticker symbol "NYNY."

13. Defendant Emanuel R. Pearlman is, and has been at all relevant times, a director of the Company and Executive Chairman of the Board.

14. Defendant Keith Horn is, and has been at all relevant times, a director of the Company.

15. Defendant Gerard Ewe Keng Lim is, and has been at all relevant times, a director of the Company, he also serves as a director of Kien Huat.

16. Defendant Edmund Marinucci is, and has been at all relevant times, a director of the Company.

17. Defendant Nancy A. Palumbo is, and has been at all relevant times, a director of

the Company.

18. Defendant Ryan Eller is, and has been at all relevant times, President and Chief Executive Officer of the company.

19. Defendant Nanette L. Horner is, and has been at all relevant times, the Chief Compliance Officer and Corporate Vice President of Legal Affairs of the Company.

20. The defendants identified in paragraphs 13 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Empire, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

21. Empire engages in hospitality and gaming businesses in New York. The company owns and operates Monticello Casino and Raceway, a video gaming machine (VGM) and harness horseracing facility in Monticello that operates 1,110 VGMs, including 1,090 video lottery terminals and 20 electronic table game positions; Resorts World Catskills, a casino resort located in Sullivan County, New York; The Alder, a 101-room modern lifestyle hotel; and Amenities, a Casino with 332 guest rooms and suites. It is also involved in conducting pari-mutuel wagering on the running of live harness horse races; the import simulcasting of harness and thoroughbred horse races from racetracks across the United States and internationally; and the export simulcasting of its races to offsite pari-mutuel wagering facilities, as well as in the development of golf course. The company has a strategic alliance with bet365 Group Limited to offer an online sportsbook, online casino/table games, and online poker in New York State. The company was founded in 1993 and is based in Monticello, New York. The Company operates as a subsidiary of Kien Huat.

22. Pursuant to the terms of the Merger Agreement, each share of Empire common stock will be converted into the right to receive $9.74 in cash per share of common stock, and with each share of the Company's Series B preferred stock receiving the same consideration on an as-converted to common stock basis.

23. On August 19, 2019, Empire issued a press release announcing the Proposed Transaction, which states in relevant part:

24.

### Empire Resorts to be Acquired by Kien Huat Realty III Limited and Genting Malaysia Berhad

MONTICELLO, N.Y., Aug. 19, 2019 /PRNewswire/ -- Empire Resorts, Inc. (NasdaqGM: NYNY) ("Empire Resorts" or the "Company") today announced a definitive agreement under which affiliates of Kien Huat Realty III Limited ("Kien Huat") and Genting Malaysia Berhad ("Genting Malaysia") will acquire all of the outstanding equity of the Company not currently owned by Kien Huat or its affiliates for $9.74 in cash per share of common stock, and with each share of the Company's Series B preferred stock receiving the same consideration on an as-converted to common stock basis. Kien Huat is currently the holder of approximately 86% of Empire Resorts' outstanding shares of common stock, including common stock issuable upon conversion of the Company's Series F convertible preferred stock.

The purchase price represents a premium of approximately 15% over the closing share price of Empire Resorts' common stock on August 16, 2019, the last trading day prior to today's announcement. The Board of Directors of Empire Resorts has approved the transaction on the unanimous recommendation of the previously formed special committee of independent directors.

Empire Resorts and Kien Huat also amended Kien Huat's existing preferred stock commitment letter with the Company, which, subject to the terms thereof, enhances Empire Resorts' access to capital through February 2020. The amendment increases Kien Huat's remaining commitments from $52 million to $77 million. This credit support will enable the Company to continue satisfying its debt obligations, while facilitating its operating strategy.

"We are pleased to reach this agreement and provide immediate certain cash

value to our stockholders," said Keith Horn, independent director of Empire Resorts and chair of the special committee. "Kien Huat has been a true partner for Empire Resorts, and we look forward to welcoming Genting Malaysia into our ongoing relationship. With Kien Huat and Genting Malaysia, we will be part of an extensive and attractive organization with enhanced scale and global reach. Importantly, Kien Huat has agreed to provide incremental credit support to Empire Resorts, which will enable the Company to meet its debt obligations as we continue to execute on our business strategy."

Ryan Eller, President and Chief Executive Officer of Empire Resorts, said, "With the resources and support of Kien Huat and Genting Malaysia, Empire Resorts will be better positioned financially and operationally, which will help us advance our mission of delivering a winning combination of luxury facilities, quality entertainment and exceptional customer service. This transaction is a win-win for all our stakeholders, including our stockholders, customers, employees, creditors and the communities in which we operate. Importantly, we expect our employees will benefit from new opportunities for career development as part of a larger organization. I look forward to working closely with Kien Huat and Genting Malaysia to seamlessly complete the transaction."

**Transaction Details**
Under the terms of the agreement, Empire Resorts' special committee, with the assistance of its financial advisor, will conduct a 10-business day "go-shop" process following the date of the announcement of the definitive agreement, during which it will actively initiate, solicit, encourage and evaluate alternative acquisition proposals, and potentially enter into negotiations with any parties that may offer alternative acquisition proposals. This process will facilitate our efforts to maximize value for stockholders. Empire Resorts will have the right to terminate the definitive agreement to accept a superior proposal, if one is received, subject to the terms and conditions of the definitive agreement. There can be no assurance that this "go-shop" process will result in a superior proposal or that any other transaction will be approved or completed. Empire Resorts does not intend to disclose developments with respect to the solicitation process unless and until its special committee makes a determination requiring further disclosure.

The transaction is expected to close in the fourth quarter of 2019. The transaction requires "majority of the minority" stockholder approval and provides an opportunity for Empire Resorts' stockholders to exercise their appraisal rights in connection with the proposed transaction. The transaction is also subject to the satisfaction of customary closing conditions and regulatory approvals, including obtaining specified gaming authority approvals and performance of the parties' contractual obligations through closing. Kien Huat has also entered into a voting agreement under which it has committed its voting shares in support of the transaction. Upon

completion of the transaction, Empire Resorts will become a privately-held company and its common stock will no longer be listed on any public market.

Moelis & Company LLC is serving as financial advisor to Empire Resorts' special committee and Paul, Weiss, Rifkind, Wharton & Garrison LLP is serving as its legal advisor. Cleary Gottlieb Steen & Hamilton LLP is serving as legal advisor to Genting Malaysia.

**The Proxy Omits Material Information**

25.     On September 24, 2019, Defendants filed a materially incomplete and misleading Proxy with the SEC. The Shareholder Vote on the Proposed Transaction is forthcoming. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

26.     First, the Proxy omits critical financial projections, including the net income projections and free cash flows for the Company. Net income is an irreplaceable metric for fully and fairly evaluating a company's projections and value. Similarly, the failure to disclose free cash flow projections within the Proxy provides a misleading valuation picture of Empire, and the disclosure of such in the Form SC 13E3 is insufficient. Defendants instead elected to disclose the EBITDA projections for 2019 through 2024, but even still fail to disclose Empire's projected: (i) earnings; (ii) interest; (iii) taxes; (iv) depreciation; and (v) amortization and stock-based compensation. *See* Proxy at 44-66. The failure to disclose line-item projections that compose Empire's EBITDA, free cash flows, and net income projections renders the Proxy materially incomplete and misleading.

27.     "Unlike poker where a player must conceal his unexposed cards, the object of a

proxy statement is to put all one's cards on the table face-up." *See Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1125 (8th Cir. 2019) (citing *Mendell v. Greenberg*, 927 F.2d 667, 670 (2d Cir. 1990)). In this case, only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate. This must be the case as financial projections may easily be manipulated in order to fit a narrative. Consequently, regarding future events, uncertain figures, and other "soft" information, a company may choose either to remain silent or speak with full and comprehensive veracity—but it may not provide half-truths. Accordingly, net income, cash flow, and line-item EBITDA projections must be disclosed in order to correct the material deficiencies in the Proxy.

28. Second, the Proxy contains materially incomplete and misleading information concerning the valuation analyses performed by Moelis & Company LLC ("Moelis").

29. With respect to Moelis' *Discounted Cash Flow Analysis*, the Proxy omits several key inputs and assumptions critical to arriving at their implied per share value ranges. Regarding Moelis' range of discounts rates, the Proxy omits the values of the estimated after-tax unlevered free cash flows for the period from October 1, 2019 to December 31, 2024, and the inputs and assumptions in estimating the terminal multiples at 7.0x to 9.0x to a terminal year 2024 Adjusted EBITDA. Furthermore, the results of the analysis lead to two drastically different scenarios and the Proxy fails to disclose which of these scenarios is more likely.

30. These items are material to Empire shareholders, and their omission renders the summary of Moelis' *Discounted Cash Flow Analyses* incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of

which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. *The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.*

*Id.* at 1577-78 (emphasis added).

Without the above-mentioned information, Empire's shareholders cannot evaluate for themselves the reliability of Moelis' *Discounted Cash Flow Analyses*, make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company or was the result of an unreasonable judgment by Moelis, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

31.     Third, the Proxy omits material information necessary for Empire's stockholders to assess the significance of any conflicts of interest Moelis faced as a result of its prior and/or ongoing relationship with Empire. On page 52, the Proxy plainly states that "since January 2017, Moelis received fees from the Company and its subsidiaries for investment banking services of approximately $7,125,000." Yet, the Proxy fails to disclose a breakdown of the compensation Moelis received in connection with such services. Additionally, the Proxy states, "Mr. Gregg Polle, who served as a director of the Company from December 2010 to July 2019, was a Managing

10

Director of Moelis until July 23, 2019." While the Proxy states Mr. Polle left the Board because "he had he had accepted employment at a new firm," it fails to disclose how those inherent conflicts of interest were managed during the merger process prior to his departure. *Id.* at 24. There is an egregious conflict of interest when a Board member is also acting as the Managing Director of the Company's financial advisor. These omissions fly in the face of the disclosure requirements of the Exchange Act and misleads shareholders as to the nature of Moelis' relationship with Empire and the conflicts of interests Moelis faced.

32. As courts have consistently emphasized, "[i]information that bears on whether an investment bank faces conflicts of interest is material to stockholders when deciding how to vote on a merger…." *In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d 54, 105 (Del. Ch. 2014). "It is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered in assessing how much credence to give its analysis. For that reason, the benefits of the Merger to the investment banker, beyond its fee, must also be disclosed to stockholders." *Id.*; *see also In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007) ("Put simply, a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the possession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.") Further, "[t]here is no rule that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict." *Rural Metro*, 88 A.3d at 105. Thus, all factors that may entice a financial advisor to favor a particular transaction must be fully disclosed.

33. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I

**(Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9)**

34. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

35. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

36. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

37. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

38. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) critical financial projections, including the net income projections and free cash flows for the Company; (ii) the valuation analyses performed by the financial advisors; (iii) the relationship between the Moelis and the Company.

39. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

40. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Moelis reviewed and discussed its financial analysis with the Board, and further states that the Board considered the financial analysis provided by Moelis, as well as the fairness opinion and the assumptions made

and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Moelis' analysis in connection with their receipt of the fairness opinions, question Moelis as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

41.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

42.     Empire is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

43.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only

through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

44. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

45. The Individual Defendants acted as controlling persons of Empire within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Empire, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

46. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

47. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They

15

were thus directly involved in preparing this document.

48.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

49.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

50.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

51.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result

of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 18, 2019

**MONTEVERDE & ASSOCIATES PC**

 */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*